____

|  |  |  |
| --- | --- | --- |
| JEROME C. KIDD, | : | Civil Action No.  18-5626 (FLW) |
|  | : |  |
|  | : | **OPINION** |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| NANCY A. BERRYHILL, | : |  |
| Acting Commissioner of Social Security, | : |  |
|  | : |  |
| Defendant. | : |  |

_____ :

**WOLFSON, United States District Judge**:

Jerome C. Kidd ("Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Nancy A. Berryhill ("Defendant"), denying Plaintiff disability benefits under Title II and XVI of the Social Security Act (the "Act") for the period from January 1, 2009 through February 27, 2014. After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and, accordingly, it is affirmed.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on February 18, 1961. Although Plaintiff originally alleged a disability onset date of February 27, 2014, he subsequently amended the alleged onset date to January 1, 2009. Administrative Record 19, 240 (hereinafter "A.R."). Plaintiff graduated from high school and attended four years of college, receiving a bachelor's degree in Psychology and Sociology. A.R. 50. Prior to his alleged disability, Plaintiff worked as an insurance agent, salesperson, department manager, and bicycle assembler. A.R. 26.

On March 19, 2014, Plaintiff applied for social security disability insurance benefits and supplemental security income, initially alleging disability, based upon mental disorder, beginning on February 27, 2014. A.R. 231. Plaintiff's claims were denied on June 20, 2014, A.R. 155-59, and again upon reconsideration on November 10, 2014. A.R. 166-71. On December 4, 2014, Plaintiff requested a hearing, A.R. 172-76, which was held on April 6, 2017 before ALJ Karen Shelton, during which Plaintiff was represented by counsel and amended the alleged disability onset date to January 1, 2009. A.R. 35-98. The ALJ determined that Plaintiff was not disabled prior to February 27, 2014, but became disabled on that date for the purposes of disability insurance benefits and supplemental security income. A.R. 19-28. Plaintiff requested review by the Appeals Council, which was denied on February 16, 2018. A.R. 1-5. On April 6, 2018, Plaintiff filed the instant appeal.

A.      **Review of the Medical Evidence**[1]

On September 28, 2012, Plaintiff was admitted to a hospital as an inpatient with complaints of "feeling very suicidal." A.R. 407. Plaintiff was described as having a "history of major depressive disorder" and Plaintiff admitted to "two prior suicide attempts" in 2003 and 2011. A.R. 407. Plaintiff "described no motivation, not feeling like doing anything, not sleeping at night but staying in bed all day, having no appetite[,] recent weight loss[,] . . . having recurrent suicidal thoughts and feel[ing] increasingly fearful and anxious"; conversely, Plaintiff denied hearing any voices, feeling paranoid, a history of hypomania or mania, and alcohol or illicit substance abuse. A.R. 407. Plaintiff indicated that his father died ten years ago, and stated that "it has been difficult

---

[1]        The underlying record contains medical documents from August 2003 and February 2007, demonstrating that Plaintiff was hospitalized with depressive complaints. A.R. 370-401. Although these records fall significantly outside of the relevant time period, as Plaintiff alleged an amended onset date beginning on January 1, 2009, the Court notes that the ALJ considered them in determining that Plaintiff "has a history of depression." A.R. 24.

since then and he has not had steady employment," although he admitted to performing "some odd jobs." A.R. 407. Plaintiff's "support system" only included his sister in New Jersey. A.R. 407.

A mental status exam revealed that Plaintiff appeared disheveled, poorly kempt, and despondent; his speech was monotonic with psychomotor retardation; his affect was blunt; and his mood was depressed. However, Plaintiff had normal gait and carriage; he was oriented in all spheres; his immediate recall and delayed recall were intact; his intellectual functioning was average to above average; his thought process was linear; he had good insight and fair judgment; he was not delusional; he felt safe on the hospital ward; he was able to approach staff if he had any intent of harming himself; and he denied hallucinations and paranoia. A.R. 408. As treatment, the examining physician prescribed 25 mg of sertraline and Plaintiff was admitted to the ITP unit of the hospital, where he underwent a negative drug test and a normal physical examination. A.R. 408.

On October 1, 2012, Plaintiff was ultimately discharged, at which time the medical provider assessed a GAF score of 50.[2] A.R. 410. The medical provider also attested to the following: "[p]atient did well during his stay in the hospital. His mood was fine. He denied any suicidal or homicidal ideations." A.R. 409. Plaintiff's condition was "[s]table. Patient is not suicidal or homicidal." A.R. 409. Moreover, his prognosis was deemed "[f]air with compliance." A.R. 410.

On February 7, 2014, Plaintiff's sister brought Plaintiff to the Emergency Department at Trenton Capital Health, because "a couple of days ago he told her he didn't feel like living." A.R.

---

[2]      GAF is an acronym referring to an individual's score on the Global Assessment of Functioning Scale. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed.  Text Revision 2000).  The scale is a tool which reflects the "clinician's judgment of [an] individual's overall level of functioning" in light of his impairments in psychological, social, and occupational functioning. *Id.* A GAF of 55-60 is indicative of a moderate impairment in social or occupational functioning. *Id.* at 34.

418, 424. The medical provider's notes indicate that, upon admission, Plaintiff reported years of "depression" and [suicidal ideation]" without a plan or intent. A.R. 419. Plaintiff explained that he had been living in Virginia for the previous five years, where he eventually became homeless and was placed in "some type of boarding home." A.R. 424. However, Plaintiff stated that he was currently living with his sister, who purchased and arranged for his transportation back to New Jersey, and that he "basically came today to satisfy" her. A.R. 421, 424, 429. A psychiatric examination demonstrated that Plaintiff's mood was depressed, his concentration was deficient, and his insight was partial. A.R. 422. However, Plaintiff appeared relaxed and well nourished; he was alert and cooperative; he was not in any obvious discomfort; he maintained eye contact; he responded appropriately to questions; his speech and affect were normal; his thought process was organized; he was oriented in all spheres; and he had immediate, recent, and remote memory recall. A.R. 422, 429. Plaintiff was eventually discharged and instructed to schedule a "follow up" appointment with a medical clinic. A.R. 435. His condition was "stable" and "without any acute distress." A.R. 435-36.

On February 27, 2014, Plaintiff underwent an initial mental status assessment at Greater Trenton Behavioral Health. A.R. 440-443. Dr. Sarah Mundassery, M.D., administered the evaluation, which revealed as follows: Plaintiff's affect was constructed; his mood was anxious; his thought content was worried; his recent memory was impaired; and his insight was partial. A.R. 441. However, Plaintiff appeared well groomed; he had good hygiene; he was cooperative; he had normal motor activity; his speech was normal; his thought process was intact, logical, and goal-directed; he was alert and oriented in all three spheres; his judgment was intact; he denied any suicidal ideations; and he denied homicidal ideations. A.R. 441. Dr. Mundassery diagnosed Plaintiff with depression and bipolar disorder, and she also opined that Plaintiff was unable to

work for a period of one year or more. A.R. 444. Records reveal that Plaintiff continued treatment at Greater Trenton Behavioral Health through July 28, 2014.

On June 20, 2014, Thomas Yared, M.D., a State agency medical consultant, independently reviewed Plaintiff's medical records. A.R. 99-110. In doing so, Dr. Yared determined that Plaintiff was not significantly limited in his capacity to perform the following tasks: understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. A.R. 106-07. However, Plaintiff was moderately limited in his capacity to perform the following tasks: remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. A.R. 107-07. Dr. Yared also opined that Plaintiff was capable of performing the basic mental demands of unskilled work. A.R. 104.

On November 11, 2014, Amy Brams, Ph. D., a State agency medical consultant, independently reviewed Plaintiff's medical records, and affirmed Dr. Yared's determinations. A.R. 125-138.

A letter, dated October 13, 2015, confirms that Plaintiff had been attending a partial care program from Monday through Thursday and sought treatment from Dr. Shaila Maddaiah, M.D., at All Access Mental Health ("AAMH") beginning on January 28, 2015. A.R. 500. The note states that Plaintiff's "attendance at and participation in the program has been exemplary. In addition, [Plaintiff] has been completely complaint with his medication." A.R. 500.

During the course of his treatment at AAMH, on August 6, 2015, Dr. Maddaiah examined Plaintiff's ability to perform work-related activities over the period of a normal workday and workweek. A.R. 497. According to Dr. Maddaiah, Plaintiff displayed a marked deterioration in his ability to function over the past 15 years. A.R. 498. She also found that Plaintiff was moderately limited in his capacity to perform the following tasks: understand and remember detailed instructions; carry out detailed instructions; make judgments on simple work-related decisions; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. A.R. 497-98. On the other hand, Dr. Maddaiah noted that Plaintiff was only slightly limited in his capacity to interact appropriately with supervisors and co-workers, and that Plaintiff had no limitations in his capacity to perform the following tasks: understand and remember short, simple instructions; carry out short, simple instructions; and interact appropriately with the public. A.R. 498. Dr. Maddaiah also performed a mental status examination, revealing as follows: Plaintiff appeared withdrawn; his speech was slow; and his thinking was slow. A.R. 498. However, Plaintiff was deemed capable of managing benefits in his own best interest A.R. 498.

A letter, dated April 4, 2017, from Brittany Baker, a partial care counselor at AAMH, also confirms that Plaintiff had been receiving mental health services at AAMH for depression and bipolar disorder, since January 28, 2015. A.R. 501. In the letter, Ms. Baker states that Plaintiff "struggles with socializing and frequently isolates. He attends psychoeducational groups and Illness Management and Recovery to decrease and manage his symptoms for the prevention of hospitalizations. [Plaintiff] also sees the Psychiatrist on site who prescribes and monitors his psych-medications regularly." A.R. 501.

A letter, dated December 4, 2017, from Carla Baker, a therapist at Oaks Integrated Care, provides as follows: "[t]hroughout [Plaintiff's] treatment it became obvious that [Plaintiff's] psychiatric condition [will] continue to impact his life and interfere with consistent and persistent ability to maintain employment, and effective social and family interaction. It is recommended that Mr. Kidd continue to receive therapy to support efforts towards wellness." A.R. 6-7.

**B.      Review of Disability Determinations**

On March 19, 2014, Plaintiff applied for social security disability insurance benefits, initially alleging disability beginning on February 27, 2014, but subsequently amending his alleged onset date to January 1, 2009. A.R. 19, 240. On June 20, 2014, the Social Security Administration denied Plaintiff's claim for disability benefits. A.R. 155-59. On November 10, 2014, the Social Security Administration denied Plaintiff's request for reconsideration, finding that the previous determination denying Plaintiff's claim was proper under the law. A.R. 166-71.

**C.      Review of Testimonial Record**

**1.      Plaintiff's Testimony**

Plaintiff appeared and testified at a hearing in this matter, held on April 6, 2017, before the ALJ. A.R. 35-98. At the hearing, Plaintiff, through counsel, amended his alleged onset date from February 27, 2014 to January 1, 2009.

Plaintiff testified that he resides in an apartment, by himself, although he has three children, two of which are minors. A.R. 47-48. Plaintiff stated that, since he stopped working in 2009, he has received "general assistance," food stamps, Medicaid Health Insurance, and performed "odd jobs" for money. A.R. 48. Plaintiff explained that he does not currently possess a valid driver's license, because it was suspended as a result of delinquent child support; however, he uses public transportation to travel. A.R. 49. Plaintiff stated that he graduated high school and completed four years of college, with a Bachelor's degree in both Psychology and Sociology. A.R. 49.

When asked about his prior work history, Plaintiff testified that he was previously employed as a licensed insurance agent for Morgan Merrill Company in 2003, managing various policies for clients. A.R. 50-51. Plaintiff stated that he eventually resigned from Morgan Merrill following the death of his father, because he began experiencing "panic attack episodes at work[.]" A.R. 52-53. Plaintiff indicated that, from approximately 2004 to 2007, he was employed with Wal-Mart, initially assembling bicycles, and then working as the department manager of the housing goods department. A.R. 53-56. Subsequently, Plaintiff mentioned that he worked at Macys selling suits, as well as Ross, where he became "very frustrated one day and quit." A.R. 57-58. Plaintiff explained that he eventually obtained employment at "Called Cemetery Services," selling cemetery plots and mausoleums for approximately six months, until approximately 2010. A.R. 58-60.

When asked what has kept him from seeking further employment, Plaintiff stated "[w]ell I became homeless for a period of time, and that—I was too unstable then to work." A.R. 60.

Plaintiff testified that he was eventually housed by a service called HELP during the winter months in Virginia, following which he moved from "church to church," sleeping on the floors. A.R. 61. Plaintiff further testified that, after having learned of Plaintiff's circumstances, his sister paid and arranged for his transportation to New Jersey, and he lived with her from about February through October of 2014. A.R. 62. Plaintiff explained that, after arriving in New Jersey, his sister required him to "seek help immediately" because she noticed that "I wasn't myself." A.R. 63.

When asked about the symptoms which prevented him from working, Plaintiff mentioned that "my attention span is really not there. My memory is pretty shot. I do something and I can't remember. I'm tired a lot." A.R. 63. Plaintiff indicated that he lacks motivation and struggles with "the ability to follow instructions thoroughly." AR. 67. Plaintiff stated that, despite these limitations, he could perform "something simple," requiring him to do "the same thing over and over again" with written instructions. A.R. 67. Plaintiff testified that, although he stays "away from other people," he gets along with them "fine" if required. A.R. 68. Plaintiff further testified that he volunteers at "National Alliance for Mental Illness," and his responsibilities include "stamping brochures, handling incoming mail, stamping checks for deposits, folding and stuffing mailings, and updating membership letters." A.R. 68. Plaintiff explained that he also receives tasks from the "operations director." A.R. 69.

When asked about his treatment, Plaintiff stated that "I was in Intensive Out-Patient, at Greater Trenton" during the years 2014 through 2015. A.R. 70. Plaintiff further stated that he participated in group therapy at Greater Trenton from Monday through Thursday, for three hours a day. A.R. 70. Plaintiff explained that he was subsequently transferred to AAMH in 2015, because he "graduated" from the Intensive-Out Patient program at Greater Trenton. A.R. 70, 72. Plaintiff mentioned that he initially received treatment at AAMH four days a week, from 9am to 3:30pm;

however, beginning in August of 2016, he began "volunteer[ing] three days a week" and attending program two days a week. A.R. 72.

Plaintiff explained that, although he "try[s] to stay productive while" volunteering at AAMH, he feels "exhausted" after "the days that [he] work[s]" because of the "activity level and . . . stress in the office." A.R. 76. Plaintiff clarified that "the operations director is pretty hands-on, so I deal with her a lot more in the day. And it just gets kind of taxing after a while." A.R. 76. Plaintiff stated that he could perform "a job where [he] didn't really have to interact with too many other people[]" if he "could take breaks there when [he] needed to . . ." A.R. 77. Plaintiff explained that he would probably require a break every "half an hour or so . . . [j]ust to—just stop, take a walk, breath, you know, just kind of recover." A.R. 77.

When asked about his daily activities on the weekends, Plaintiff stated that he does "laundry, cleans the apartment, and . . . sleep[s]." A.R. 79. Plaintiff indicated that he tries to see his sister "every other week," and has "family night" about once a month. A.R. 79. Plaintiff stated that he does not own a television, but occasionally reads "biographies about people who are bipolar." A.R. 80.

In response to his attorney's questions, Plaintiff explained that, prior to leaving Virginia," he "went to Crises" in 2012 because he was "suicidal at the time," and received treatment from a facility called Riverside for acute depression. A.R. 81-82. Plaintiff indicated that, while volunteering, he is permitted to take as many breaks as he requires. A.R. 83. Plaintiff further indicated that he does not go to the movies, belong to any clubs, or go out with friends on a regular basis. A.R. 83. Plaintiff explained that his energy levels are "pretty good" on "some days," but nonexistent on other days. A.R. 85. Plaintiff mentioned that he is not currently receiving any

treatment for suicidal ideations, although his self-esteem "could be better." A.R. 85-86. Plaintiff

further mentioned that he experiences nervousness "anytime I'm doing something new." A.R. 88.

### 2. Testimony of the Vocational Expert

Michael Frain testified as a Vocational Expert ("VE") at the hearing held on April 6, 2017,

before the ALJ. A.R. 93-98. The VE was provided with four hypotheticals by the ALJ. The ALJ

first posited the following:

> [A]ssume an individual of the Claimant's age and education with the past
> jobs you've just classified. Further, . . . assume they are limited as follows:
> there are no exertional limitations in this hypothetical. Assume the
> individual is able to understand, remember, and carry out simple, routine,
> and repetitive tasks in a work environment free of fast-paced production
> requirements involving only simple work-related decisions with few, if any,
> workplace changes; can work for two hours before needing a break; can
> have occasional contact with supervisors, coworkers, and the public, the
> contact being brief and superficial in nature. Given those limitations, could
> the hypothetical individual perform any of the past work you've classified?

A.R. 94-95. The VE responded "[n]o, Your Honor, he would not be able to perform past work,

based on it all being skilled or semiskilled." A.R. 95. However, when asked whether there were

any unskilled occupations in the national economy that the hypothetical individual above could

perform, the VE opined that such an individual could work in the following positions: hospital

cleaner, DOT# 323.687-010; linen loom attendant DOT# 222.387-030; and industrial cleaner

DOT# 381.687-018. The VE testified that these jobs, in the aggregate, are available in the amount

of approximately 300,000 nationally. A.R. 95.

The ALJ's second hypothetical was:

> [A]ssume all the limitations from the first hypothetical, but assume that, due to
> psychological symptoms, that the individual will be off task or need to be redirected
> or reinstructed to the work at least 10 percent of the day, over and above normal
> workday breaks, or that they would be absent two or more days per month. Would
> that hypothetical individual be able to perform any work in the national economy?

A.R. 96. The VE responded that such an individual would not be able to perform any jobs in the national economy. A.R. 79.

The ALJ's third hypothetical was: "if the only limitation were the off task, leaving aside the absences, if absences weren't an issue, but if they were off task 10 percent of the time, they could hold a job?" A.R. 96. The VE responded in the affirmative. Finally, the ALJ's fourth hypothetical was: "if the hypothetical were 15 percent off task during the day, they would not be able to hold a job, is that correct?" A.R. 97. The VE similarly responded in the affirmative. A.R. 97.

### D.  ALJ's Findings

The ALJ issued a written decision, following the hearing, on September 1, 2017. A.R. 19-28. The ALJ began by finding that Plaintiff met the insured status requirement of the Social Security Act to remain insured through December 31, 2013. A.R. 24. Next, the ALJ applied the standard five-step process to determine if Plaintiff had satisfied his burden of establishing disability.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2009, the alleged onset date. A.R. 21.

Second, the ALJ found that Plaintiff had the following severe impairments: "affective disorder." A.R. 21-22.

Third, the ALJ found that Plaintiff does not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under the Act that would qualify for disability benefits. A.R. 22. The ALJ initially noted that no medical expert mentioned findings that paralleled any listed impairment, and that the medical record did not merit any such findings. A.R. 22. Nevertheless, in this step, the ALJ considered Plaintiff's

medical impairments under listing 12.04. A.R. 22. Specifically, the ALJ considered the "paragraph B" criteria of listing 12.04, and found that those criteria could not have been satisfied because Plaintiff's limitations in the areas of mental functioning were only moderate. A.R. 22. The ALJ also considered the "paragraph C" criteria of listing 12.04 and found those criteria unsatisfied as well, because there was no evidence that Plaintiff "has a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life." A.R. 22.

Fourth, the ALJ found that, prior to February 27, 2014, Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

> [Plaintiff is] able to understand, remember and carry out simple, routine and repetitive tasks in a work environment free of fact-paced production requirements involving only simple, work-related decisions with few, if any, work-place changes; can work for 2 hours before needing a break; and can have occasional contact with supervisors, co-workers and the public, with contact being superficial in nature.

A.R. 23-24. Moreover, the ALJ found that, beginning on February 27, 2014, Plaintiff's residual functional capacity was identical to the one formulated above, with the exception of the following additional limitation:

> [Plaintiff] is expected to be off task or need to be redirected or reinstructed at least 15% of the day over and above normal work breaks or absent 2 or more days per month.

A.R. 25. In reaching these RFC determinations, the ALJ considered Plaintiff's statements concerning his own limitations, relevant medical evidence concerning both his alleged physical and mental impairments, and medical source opinion evidence. A.R. 23-24.

The ALJ did not assign "any significant weight" to Plaintiff's GAF scores, noting that the DSM-V, published by the American Psychiatric Association in 2013, had dropped the use of the

GAF scale because of their conceptual lack of clarity and questionable psychometrics in routine practice.

The ALJ assigned little weight to the statement of Plaintiff's case manager, given in a third-party function report, because it constituted a lay opinion based upon casual observation and interaction of Plaintiff after a month period, rather than objective medical and testing. A.R. 24.

The ALJ assigned some weight to the opinion of Dr. Mundassery who opined that Plaintiff was disabled from February 27, 2014 through February 27, 2015. A.R. 25. The ALJ noted that the issue of whether Plaintiff was totally disabled is reserved for the Commissioner. A.R. 25.

The ALJ also assigned some weight to the opinions of State agency medical consultants Dr. Yared and Dr. Brams, with respect to Plaintiff's ability to perform various living and work-related activities. A.R. 26. In assigning some weight to these opinions, the ALJ found that the evidence of record supported greater limitations. A.R. 26.

The ALJ, however, assigned great weight to the opinion of Dr. Maddaiah, who determined that Plaintiff was moderately limited in his ability to perform various work related tasks, and also found a marked deterioration in Plaintiff's ability to function over time. A.R. 26. In assigning great weight to Dr. Maddaiah's Opinion, the ALJ indicated that it was consistent with other medical evidence. A.R. 26.

Fifth, the ALJ found that, prior to February 27, 2014, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity, "there were jobs that existed in significant numbers in the national economy that the claimant could have performed." A.R. 27. In reaching this determination, the ALJ relied on the testimony of a vocational expert that an individual with Plaintiff's age, education, past relevant work experience, and residual functional capacity could perform the following representative occupations: Hospital Cleaner DOT#

323.687-010; Linen Room Attendant DOT# 222.387-030; and Industrial Cleaner DOT# 381.687-018, which the vocational expert testified existed in the national economy in the aggregate amount of approximately 300,000. A.R. 27. Conversely, the ALJ found that, beginning on February 27, 2014, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity, "there are no jobs that exist in significant numbers in the national economy that the claimant can perform[.]" A.R. 28.

Accordingly, the ALJ concluded that "[t]he claimant was not disabled prior to February 27, 2014, but became disabled on that date and has continued to be disabled through the date" of the ALJ's decision. A.R. 28.

## II.     DISCUSSION

### A.     Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant

evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ

determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the

claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id*.

**B.    Analysis**

Plaintiff makes three arguments on appeal as to why the ALJ's disability determinations were unsupported by substantial credible evidence. First, Plaintiff argues that the ALJ erred by finding that Plaintiff did not suffer from an impairment that equaled the requirements of Listing 12.04. Second, Plaintiff argues that the ALJ erred in his determination of Plaintiff's RFC, prior to February 27, 2014. Third, Plaintiff argues that the ALJ erred in finding that Plaintiff could perform jobs existing in significant numbers in the national economy, prior to February 27, 2014. The Court addresses each argument in turn.

**1.    Listing 12.04**

As a threshold issue, Plaintiff argues that the ALJ erred at step three of the 20 C.F.R. § 404.1520 analysis, because the ALJ failed to adequately support her finding that Plaintiff did not satisfy the criteria of Listing 12.04 with "sufficient rationale." Plaintiff's Support Brief ("Pl.'s Brief"), at 25. Rather, Plaintiff contends that the ALJ's determination, in this regard, is conclusory and precludes the Court from conducting a meaningful review of the judgment. *Id*. Moreover,

Plaintiff maintains that the ALJ's finding of non-disability at step three directly conflicts with the determination of Plaintiff's RFC at step four, wherein the ALJ held that Plaintiff was limited to "superficial" contact with supervisors, coworkers, and the public. *Id*. at 25. Such a restriction, according to Plaintiff, constitutes an "extreme" limitation for the purposes of finding presumptive disability pursuant to Listing 12.04. *Id*. Finally, Plaintiff argues that, at a minimum, he met the requirements of Listing 12.04 from September 9, 2012 through February 27, 2014, during which period he was homeless. *Id*. at 26. However, Plaintiff's contentions are without merit.

In *Burnett v. Commissioner of SSA*, 220 F.3d 112 (3d. Cir. 2000), the Third Circuit held that an ALJ must provide an adequate explanation of his or her finding at step three, so that a reviewing court can engage in a meaningful judicial review. *Burnett*, 220 F.3d at 119-120. The ALJ's obligation, in this regard, was further clarified in *Jones*, wherein the Third Circuit adopted a flexible approach, holding: "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones,* 364 F.3d at 505 (citation omitted). Therefore, in light of this principal, it is well-established that "an ALJ need not specifically mention any of the listed impairments in order to make a judicially reviewable finding, provided that the ALJ's decision clearly analyzes and evaluates the relevant medical evidence as it relates to the Listing requirements." *Scuderi v. Comm'r of Soc. Sec.*, 302 F. App'x 88, 90 (3d Cir. 2008).

In this case, the ALJ's decision, read in its entirety, indicates that the ALJ discussed the appropriate factors in determining that Plaintiff did not satisfy the criteria of Listing 12.04, governing depressive and bipolar disorder. In order to meet that listing, a claimant's mental impairments must satisfy the requirements set forth in Listing 12.04's paragraph A and either one

of paragraph B or paragraph C. Specifically, the paragraph B criteria require evidence showing an extreme limitation of one, or a marked limitation of two, of the following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. Moreover, the paragraph C criteria require a medically documented history of the existence of a mental disorder over a period of at least two years, as well as evidence of: (1) medical treatment, mental health therapy, psychological support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of a mental disorder; and (2) marginal adjustment, that is, a minimal capacity to adapt to changes in the environment or to demands that are not already part of a claimant's daily life. 20 CFR, Part 202, Subpt. P, App'x 1.

Here, the ALJ provided an adequate explanation in support of the step three determination. In finding that Plaintiff was not presumptively disabled, the ALJ considered each of the applicable criteria set forth in paragraph B and paragraph C of Listing 12.04. As to the criteria set forth in paragraph B, the ALJ determined that Plaintiff's limitations in the areas of mental functioning are moderate; moreover, as to the criteria set forth in paragraph C, the ALJ found that the medical evidence failed to establish that Plaintiff had a minimal capacity to adapt to changes in either his environment or daily life. A.D. 22. The ALJ's findings are not conclusory, but are instead based upon substantial evidence. Indeed, the ALJ's conclusion is consistent with Plaintiff's own testimony in connection with his ability to "follow simple instructions" and "participate[] in group therapy sessions," as well as the professional opinions of various medical experts—none of whom "concluded that the claimant's impairments [met] or [equaled] a listed impairment." A.R. 22. The ALJ also found that the following examples evidenced Plaintiff's ability to adapt to the changes in his environment: "since February 2014, he went from being homeless in Virginia to living with

his sister in New Jersey. Then he moved into supportive housing and recently secured Section 8 housing. He also completed an intensive outpatient program and recently started volunteering." A.R. 22. Accordingly, the ALJ sufficiently developed the record and explained the pertinent findings such that the determination at step three was supported by substantial evidence.

Plaintiff's remaining arguments in connection with the ALJ's step three determination are equally without merit. Plaintiff contends that a finding of presumptive disability is appropriate at step three, because the ALJ's RFC determination, at step four, included the following restriction: Plaintiff can have occasional contact with supervisors, co-workers and the public, with contact being "superficial" in nature. Without citing any statutory authority or case law, Plaintiff, instead, "suggests" that the restriction of "superficial" contact constitutes an extreme limitation for the purposes of meeting the paragraph B criteria of Listing 12.04. Pl.'s Brief 25. Notwithstanding the fact that Plaintiff's position is entirely baseless, Plaintiff inappropriately conflates the ALJ's analysis at step three with that at step four, both of which require separate determinations and standards. Nevertheless, Plaintiff's contention conflicts with the law, given that district courts routinely find that a claimant's limitation to "superficial" contact with supervisors, coworkers, and the public is consistent with moderate mental functioning restrictions. *Hyer v. Colvin*, No. 15-297, 2016 U.S. Dist. LEXIS 134304, at *40 (D. Del. Sept. 29, 2016) ("[A]n RFC accurately encompasse[s] a plaintiff's moderate limitations in social functioning when the plaintiff was limited to 'occasional' or 'superficial' contact with supervisors, co-workers, or the public."); *see also Pidgeon v. Colvin*, No. 15-2897, 2016 U.S. Dist. LEXIS 61435, at *13 (D.N.J. May 9, 2016); *McCarthy v. Colvin*, No. 13-5618, 2014 U.S. Dist. LEXIS 176223, at *12 (D.N.J. Dec. 19, 2014).

Finally, Plaintiff argues that the ALJ should have determined that Plaintiff satisfied Listing 12.04 from September 9, 2012 through February 27, 2014, a period during which he was homeless.

Pl.'s Brief, 26. In support, Plaintiff contends: "there is nothing in the decision of the [ALJ] . . . that explains how the [ALJ] reached her conclusion that [the criteria of paragraph B and paragraph C] were not" met during that time. *Id.* at 26. However, Plaintiff has failed to provide any cogent medical evidence during the period specified above, upon which to base a finding of presumptive liability. *Poulos v. Comm'r of Social Security*, 474 F.3d 88, 92 (3d Cir. 2007) (holding that a claimant must adequately demonstrate that an alleged impairment meets or equals a relevant listing). In fact, the only medical record from that period, dated October 1, 2012, describes Plaintiff's condition as "stable." A.R. 407. As such, the ALJ's step three determination was not made in error.

## 2. The RFC Determination

Next, Plaintiff argues that the ALJ's RFC determinations are not based on substantial evidence. Pl.'s Brief, at 27. As stated above, the ALJ formulated a separate RFC for the period prior to, and the period beginning on, February 27, 2014. *Id.* Indeed, the RFC determinations for these periods are identical, with the exception that the RFC for the later period contains an additional restriction, *i.e.*, "[Plaintiff] is expected to be off task or need to be redirected or reinstructed at least 15% of the day over and above normal work breaks or absent 2 or more days per month. A.R. 25. According to Plaintiff, the ALJ's RFC determinations are inherently "inconsistent," because the additional restriction was contained in the later RFC, notwithstanding the fact that Plaintiff's functioning was "worse" prior to February 27, 2014. The only support for that assertion is Plaintiff's homelessness status during that time. In that connection, Plaintiff argues that, instead of "imagin[ing]" that Plaintiff's condition declined after February 27, 2014, the ALJ was required to consult with a "medical advisor" pursuant to SSR 83-20,[3] in an attempt to discern

---

[3]     As the Third Circuit has held, "SSR 83-20 recognizes that sometimes reasonable inferences about the progression of [an] impairment cannot be made on the basis of the evidence in file and

the appropriate date on which Plaintiff became disabled. Plaintiff's contentions are entirely unsubstantiated.

Here, Plaintiff's reliance on his homelessness status in support of an earlier onset date, and the need for the ALJ to call upon a medical consultant, is purely based upon speculation and contrary to the medical record. Indeed, as stated, the only treatment record from the time of Plaintiff's amended onset date, *i.e.*, January 1, 2009, to February 27, 2014, the actual onset date, consists of a medical provider's note from September of 2012—a point which Plaintiff concedes: "[w]e do note that this lack of evidence for this period is a problem." Pl.'s Brief, at 30. Significantly, Plaintiff's condition, as described therein, is deemed to be "stable" and his prognosis is characterized as "fair with compliance." A.R. 407. However, notwithstanding the absence of "objective evidence," the ALJ formulated an RFC, prior to the actual disability onset date, which provided Plaintiff with "the greatest benefit of the doubt." A.R. 24. Moreover, the RFC, for the period beginning on February 27, 2014, contained an additional functional restriction that is entirely consistent with the evidence of record. Indeed, the ALJ accurately determined: "the evidence of record . . . shows ongoing symptoms despite intensive outpatient treatment" beginning on February 27, 2014. A.R. In other words, the record failed to demonstrate an improvement in Plaintiff's condition as time progressed, which the ALJ accurately observed in her later RFC determination. At the hearing, Plaintiff clarified that his difficulties with "attention span,"

---

additional relevant medical evidence is not available and states that in such cases it may be necessary to explore other sources of documentation." *Beasich v. Comm'r of Soc. Sec.*, 66 Fed. Appx. 419, 430 (3d Cir. 2003). However, SSR 83-20 does not apply here, because the ALJ found that Plaintiff's impairment, prior to 2014, did not qualify Plaintiff for disability benefits. That decision was based on a lack of medical evidence to substantiate Plaintiff's impairments and a 2012 hospital record wherein the doctor characterized Plaintiff's condition as follows: "[s]table. Patient is not suicidal or homicidal." A.R. 409. As such, the ALJ was not under any obligation to "explore other sources of documentation" for the purposes of determining Plaintiff's actual onset date, pursuant to SSR 83-20.

"stay[ing] occupied on the very same thing for very long," and his need to take "some breaks" during a normal work day, are examples of "recent problem[s]." A.R. 66. Accordingly, the ALJ's RFC determinations, and the inclusion of additional restrictions in the RFC beginning on February 27, 2014, are not in contravention with the available medical evidence.

### 3. Alternative Work Activity

Finally, Plaintiff contends that the ALJ erred in holding that he possessed the capacity to perform alternative work prior to the established onset date, because Plaintiff was restricted to "superficial" contact with supervisors, co-workers and the public. Pl.'s Brief, at 33. According to Plaintiff, this limitation precluded him from "engaging in any real-world work activity," rendering him disabled. *Id*. Moreover, in a one-sentence argument, Plaintiff claims that: "[t]he testimony as to how many of the jobs referenced by the vocational expert and accepted by the [ALJ] exist in the national economy is not supported by the evidence." *Id*. Plaintiff's arguments are, again, unsubstantiated.

In this case, at step five, the ALJ relied on the testimony of a vocational expert in concluding that Plaintiff could perform three categories of jobs prior to February 27, 2014: (1) hospital cleaner, DOT# 323.687-010; (2) linen loom attendant DOT# 222.387-030; and (3) industrial cleaner DOT# 381.687-018. The vocational expert testified that these jobs, in the aggregate, exist in the amount of approximately 300,000 nationally, which testimony the ALJ adopted. Significantly, counsel did not challenge these representations during Plaintiff's hearing. Nor does Plaintiff provide, on this appeal, a basis upon which to find that the ALJ's determination in this context was made in error. Instead, Plaintiff merely cites a case which "the Supreme Court has recently agreed to hear," without any legal argument in connection therewith. Pl.'s Brief, at 33-34. Clearly, the Court need not consider Plaintiff's argument that lacks any legal reasoning.

Likewise, as already explained, Plaintiff's contentions with respect to the restriction of "superficial" contact does not preclude him from engaging in work activities. *See, supra*. Accordingly, Plaintiff has failed to show that the ALJ's step five determination was not grounded in substantial evidence.

## III. CONCLUSION

For the reasons set forth above, the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed.


Dated: November 9, 2018

/s/ Freda L. Wolfson
Freda L. Wolfson
United States District Judge